# EXHIBIT A

**NOTICE**

*(recommended by the Fourteenth Session of*
*Hague Conference of October, 1980)*

**identité et adresse du destinataire**
*identity and address of the addressee*

---

Carmel BORG, *an individual*

11 Stewart Drive

Guelph

Ontario N1H 6H7

CANADA

**-OR-**

wherever the Defendant may be found in Canada

---

**TRÈS IMPORTANT**

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES "ÉLÉMENTS ESSENTIELS DE L'ACTE" VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES :

Central Minnesota Legal Services
430 First Avenue North, Suite 359
Minneapolis, Minnesota 55401
U.S.A.
Tel. 1.612.334.3970

**IMPORTANT**

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE "SUMMARY OF THE DOCUMENT TO BE SERVED" WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD, HOWEVER, READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

Central Minnesota Legal Services
430 First Avenue North, Suite 359
Minneapolis, Minnesota 55401
U.S.A.
Tel. 1.612.334.3970

## SUMMARY OF THE DOCUMENT TO BE SERVED
*ELEMENTS ESSENTIELS DE L'ACTE*

Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudiciares en matière civile ou commerciale, signée à La Haye, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa 4)*

| | |
|---|---|
| **Name and address of the requesting authority:** | Tom R. McLean, Esq. |
| *Nom et adresse de l'autorité requérante :* | LEGAL LANGUAGE SERVICES |
| | 8014 State Line Road, Suite 110, Leawood, Kansas 66208, U.S.A. |
| | Tel. 1.913.341.3167 |

**Particulars of the parties*:**
*Identité des parties :* MN Airlines, LLC doing business as Sun County Airlines, *Plaintiff*
GLOBAL AVIATION SERVICES USA, INC. and **CARMEL BORG**, *Defendants*

## JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte :* To give notice to the Defendant of the commencement of a civil claim against him, and to summon him to Answer or otherwise respond.

**Nature and purpose of the proceedings and, where appropriate, the amount in dispute:**
*Nature et objet de l'instance, le cas échéant, le montant du litige :* A civil action has been commenced against the Defendant.

**Date and place for entering appearance**:**
*Date et lieu de la comparution :* Within twenty (20) days of the date of receipt of the Summons before the State of Minnesota District Court, Fourth Judicial District, County of Hennepin, located at: Hennepin County Government Center, 300 South 6th Street, C-332, Minneapolis, Minnesota 55487, U.S.A.

**Court which has given judgment**:**
*Juridiction qui a rendu la décision :* N/A

**Date of judgment''*:**
*Date de la décision :* N/A

**Time limits stated in the document**:**
*Indication des délais figurant dans l'acte :* Defendant must give or mail to Plaintiff's Attorney (Dorsey & Whitney LLP) a written response called an Answer within twenty (20) days of the date of receipt of the Summons. If Defendant does not Answer within twenty (20) days, he will lose the case. Defendant will not get to tell his side of the story, and the Court may decide against him and award the Plaintiff everything asked for in the Complaint. If Defendant does not want to contest the claims stated in the Complaint, he does not need to respond. A default judgment can then be entered against him for the relief requested in the Complaint.

## EXTRAJUDICIAL DOCUMENT**
*ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte :* N/A

**Time limits stated in the document**:**
*Indication des délais figurant dans l'acte :* N/A

---

\* If appropriate, identity and address of the person interested in the transmission of the document.
*S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.*
\*\* Delete if inappropriate.
*Rayer les mentions inutiles.*

\* U.S. Government Printing Office: 1990-262-211/15302



ERIC R. SHERMAN
(612) 492-6609
FAX (612) 340-8856
sherman.eric@dorsey.com

March 1, 2019

**HAND DELIVERED**

Carmel Borg
11 Stewart Drive
Guelph, Ontario N1H 6H7

Re:    *MN Airlines, LLC d/b/a Sun Country Airlines v. Global Aviation Services USA, Inc. et al.*

Dear Mr. Borg:

Enclosed and served upon you is the Summons and Complaint in the above-titled matter.

Sincerely,

Eric R. Sherman

Enclosures

cc:    Nicholas J. Bullard

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT
Case Type: Civil Other/Miscellaneous

| | |
|---|---|
| MN Airlines, LLC d/b/a Sun Country Airlines, | Court File No. _____ <br> (Judge _____ ) |
| Plaintiff, | |
| vs. | **SUMMONS TO** <br> **CARMEL BORG** |
| Global Aviation Services USA, Inc., and <br> Carmel Borg, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO: Carmel Borg.

1.    **YOU ARE BEING SUED.** The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights.

2.    **YOU MUST REPLY WITHIN 20 DAYS OR AS OTHERWISE ORDERED BY THE COURT TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a written response called an Answer within 20 days of the date on which you received this Summons unless otherwise ordered by the Court. You must serve a copy of your Answer to Eric R. Sherman, Esq., the person who signed the Summons, located at DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498.

3.    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4.     **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days or as otherwise ordered by the Court, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.     **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6.     **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: March 1, 2019

DORSEY & WHITNEY LLP

By
Eric R. Sherman (#0331430)
sherman.eric@dorsey.com
David Y. Trevor (#0152997)
trevor.david@dorsey.com
Nicholas J. Bullard (#0397400)
bullard.nick@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff*

2

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                                    FOURTH JUDICIAL DISTRICT
                                                     Case Type: Civil Other/Miscellaneous

|                                                    | Court File No. _____ |
| :------------------------------------------------- | :----------------------------- |
| MN Airlines, LLC d/b/a Sun Country Airlines,       |                                |
| Plaintiff,                                         | **COMPLAINT**                  |
| vs.                                                |                                |
| Global Aviation Services USA, Inc., and Carmel Borg, | **Jury Trial Demanded**      |
| Defendants.                                        |                                |

Plaintiff MN Airlines, LLC d/b/a Sun Country Airlines ("Sun Country"), for its Complaint against Defendants Global Aviation Services USA, Inc. ("Global") and Carmel Borg, states and alleges as follows:

## NATURE OF THE ACTION

1.      In this action, Sun Country seeks to hold Global and its principal, Carmel Borg, to account for (a) fraudulently inducing Sun Country to enter into a ground-handling agreement ("Agreement"); and (b) repeatedly and materially breaching that Agreement.

2.      Sun Country is a Minnesota-based airline, and its main hub is the Minneapolis-Saint Paul International Airport ("MSP Airport"). An integral part of Sun Country's operations at MSP Airport is "ground handling," which refers to the many services aircraft require between landing and takeoff, including handling baggage, checking in customers, servicing the aircraft, pushing it back from the gate, and loading and unloading cargo and mail.

3.      In 2018, Global and Mr. Borg fraudulently induced Sun Country to select Global from among many companies competing to become Sun Country's sole ground handler at MSP

Airport. Global and Mr. Borg did so by representing that Global had the experience, staff, and capabilities to perform effectively all the ground-handling functions that Sun Country required. In reality, however, Global had no such experience, staff, or capabilities, and Mr. Borg knew it. The falsity of Global and Mr. Borg's representations was made clear when, as soon as the Agreement took effect, Global failed to marshal the staff necessary to perform the agreed-upon services and began breaching the Agreement on a regular basis.

4.     Global's chronic understaffing threw a wrench into Sun Country's operations at MSP Airport, triggering a wave of flight delays, lost baggage, and customer complaints. When Sun Country confronted Mr. Borg, he placed the blame on a supposedly weak "Minnesota work ethic," and he confessed that Global had engaged in "bad faith negotiations" of the Agreement.

5.     Mr. Borg's and Global's fraud and breaches of the Agreement caused major damage to Sun Country, including: (1) lost profits from disruption to Sun Country's cargo and mail business; (2) payments to customers for lost and damaged bags; (3) payments for equipment Global destroyed or damaged; (4) replacement costs for the work Global should have done; and (5) lost profits from harm to Sun Country's reputation and brand.

## PARTIES

6.     Sun Country is a Minnesota limited liability company with its principal executive office in Eagan, Minnesota. Sun Country provides air transportation services to destinations throughout the United States, Mexico, Costa Rica, and the Caribbean. Its main and busiest hub is at Terminal 2 of MSP Airport.

7.     Global is a Delaware corporation with a registered office in Saint Paul, Minnesota. Global is engaged in providing ground-handling services to airlines.

8.     Carmel Borg is and was Global's CEO at all times material to this action.

## JURISDICTION AND VENUE

9.    This Court has personal jurisdiction over Defendants pursuant to Minn. Stat. § 543.19 because Defendants transact business within the State of Minnesota and because their actions have caused injury to Sun Country within the State.

10.    Venue in this Court is proper pursuant to Minn. Stat. § 542.09 because the claims arose, in part, in Hennepin County, Minnesota.

## FACTS

**A.    The Aviation Ground-Handling Industry and Terminology.**

11.    Aviation "ground handling" refers to services that an aircraft needs on the ground between landing and takeoff. Many airlines contract with a vendor to perform some or all their ground-handling functions.

12.    Three broad categories of ground-handling services are relevant to this action: ramp services, passenger services, and cargo and mail services.

13.    *Ramp Services.* These services usually occur on the airport ramp (also known as the "tarmac" or "apron"), and they include, but are not limited to: guiding aircraft in and out of the parking position (known as "marshalling"); towing aircraft; offloading and loading baggage; interior cleaning; draining and servicing lavatories; and de-icing aircraft.

14.    *Passenger Services.* These services occur inside the airport terminal, and include, but are not limited to: checking in passengers; verifying passenger documentation; closing aircraft; processing lost baggage; and accepting incoming passengers.

15.    *Cargo and Mail Services.* These services include receiving, transferring, scanning, and tracking cargo and mail transported by aircraft.

16.    Ground handling is labor intensive, and there is a relatively high attrition rate in ground-handing workforces, especially for outdoor Ramp Services.

17.     Because of that attrition rate, maintaining an adequate workforce is an integral and essential function of a ground-handling vendor.  To maintain that workforce, a ground-handling vendor must (1) continuously recruit and create a pipeline of candidates to fill positions as they open; (2) successfully onboard and train those candidates; and (3) work to retain its existing employees.

**B.     Sun Country's RFP for Ground Handling at MSP Airport.**

18.     In 2017, Sun Country's ground-handling operations at MSP Airport were divided between Sun Country itself and an outside vendor, Swissport International Ltd. ("Swissport").  Sun Country staffed and managed all services except Ramp Services, which were staffed and managed by Swissport.

19.     In late 2017, Sun Country decided to investigate whether to consolidate its ground-handling operations at MSP Airport with one vendor.

20.     To find the best ground-handling vendor, Sun Country issued a Request for Proposal ("RFP") on December 6, 2017, inviting vendors to submit a response.  In the RFP process, Sun Country was assisted by aviation expert, Seabury Consulting, a subsidiary of Accenture.

21.     The RFP's stated goal was "to find the most cost effective solution(s) offering the greatest value while meeting our performance and service level requirements."

22.     The RFP detailed Sun Country's operations at MSP Airport, including its projected flight frequencies and existing facilities and ground support equipment ("GSE").

23.     The RFP listed the services that Sun Country's new vendor must provide, including: all ticket counter functions, all gate functions, all baggage service functions, wheelchair services, bag room, aircraft loading and unloading, aircraft servicing, baggage transfers, aircraft cleaning, mail handling, freight handling, and more.  The RFP called for responding vendors to include a "Staffing Plan" in their responses.

24.     The RFP made clear that the new vendor would be expected to take over Sun Country's ground-handling operations at MSP Airport by May 1, 2018.

25.     At least a dozen vendors, including Global, expressed interest in the RFP and signed non-disclosure agreements in order to participate.

## C.     Defendants Fraudulently Induce Sun Country to Award Global the Ground-Handling Contract.

26.     On December 28, 2017, Global submitted its response to the RFP. Sun Country was already somewhat familiar with Global, as it was providing ground-handling services to Sun Country at two Florida airports. However, the operations at those Florida airports are much smaller, so Sun Country did not have experience with how Global would perform at a hub like MSP Airport.

27.     In its RFP response, Global represented that it was able to perform all the services outlined in the RFP at MSP Airport. Global identified several of its operations that were similar in size and complexity to Sun Country's operations at MSP Airport, and represented that it had the expertise and experience to run those larger, more-complex operations.

28.     When Sun Country requested a staffing plan, Global supplemented its RFP response on December 29 with a "transition plan for MSP" along with a staffing chart (together, "Transition Plan"). In the Transition Plan, Global made specific representations about the number of supervisors, managers, and employees it would provide for ramp, passenger, and cargo services for each day of the week. Global also represented that its "labor solution for both passenger services and ramp is wholly dedicated to your airline which will never change," and promised to "[m]aintain planned staff count and quality," to "over hire by 10% to account for any early attrition," and to aim for an attrition "rate of 20%." The Transition Plan also included specific representations about Global's "recruitment plan."

29.     After a series of follow-up submissions and discussions, Sun Country narrowed the field of vendors to six finalists, one of which was Global, and invited each finalist to an individual meeting.

30.     Sun Country's meeting with Global took place on January 22, 2018.  During that meeting, Sun Country explained to Global its plans for the future, objectives for the RFP, and expectations for a ground handler.  Global assured Sun Country it had the ability to meet all those expectations and perform all the work in the RFP.

31.     Of the finalists, Sun Country initially viewed Global as the least likely to secure the work because it was the smallest.  However, Sun Country remained open-minded and invited Global to another in-person meeting at its Eagan headquarters.

32.     That in-person meeting with Global took place on February 9, 2018.  At the February 9 meeting, Global was represented by its CEO, Mr. Borg, its COO, Jim Murphy, its Senior Vice President, John Brown, and four other executives.  The Global team gave a presentation claiming that Global had the experience, personnel, and capabilities to perform effectively all the ground-handling functions that Sun Country needed at MSP.  Global made specific representations about (1) the numbers of supervisors and managers it would provide (e.g., six Ramp and Passenger Services managers); (2) the specific number of agents it would provide in the morning, afternoon, and evening for Ramp, Passenger, and Cargo and Mail Services; (3) its "recruitment plan" and commitment to "[m]aintain planned staff count & quality"; and (4) its commitment to "over hire by 10% to account for any early attrition" and aim for an "attrition rate of 30%."

33.     Throughout the February 9 presentation, Sun Country questioned Mr. Borg and his team about Global's capability to staff and perform the services.  The Global team answered each

question. Near the end of the meeting, Mr. Borg concluded by reiterating his complete confidence that Global had the experience, personnel, and capabilities to perform all the services outlined in the RFP.

34.     After the meeting, and based on Mr. Borg's and his team's representations, Sun Country viewed Global as the most likely finalist to secure the ground-handling work.

35.     In the following days, Sun Country asked Global follow-up questions about its staffing plans. On February 13, Global's COO, Mr. Murphy, emailed Sun Country, explaining the "credibility of our [staffing] methodology" and reassuring Sun Country that, "I'm confident in our staffing."

36.     On February 13 and 14, after additional communication between the parties, Global submitted its final bid and staffing chart. In those materials, Global again represented that it had the capability to perform all the services specified in the RFP, and again made specific representations about the number of supervisors, managers, and employees it would provide for all those services.

37.     Based on Global's RFP response, its representations (through Mr. Borg and others) that it was capable of performing all the work specified in the RFP at MSP Airport, its assurances about staffing, and its assurances that it would maintain staff levels and keep attrition under control, Sun Country awarded Global the MSP Airport ground-handling work on February 16, 2018.

38.     Sun Country would not have awarded the work to Global, nor would it have entered into the Agreement that followed, if Global and Mr. Borg had not made those representations.

**D.     The Ground-Handling Agreement.**

39.     On or about February 19, 2018, Sun Country and Global entered into a written Standard Ground Handling Agreement ("SGHA") with Annexes A and B1.0. In April 2018, the

7

parties also entered into Annex B1.1. The SGHA and its Annexes A, B1.0, and B1.1 together form the "Agreement."

40. Under the Agreement, Global agreed it "shall provide" all the ground-handling services and duties that the parties specified in the Agreement for all Sun Country's arriving and departing flights at MSP Airport.

41. The Agreement specifically identified the Ramp Services that Global would provide, including: loading and unloading aircraft; marshalling and parking aircraft; operating baggage rooms; transferring baggage; servicing aircraft lavatories and water; cleaning aircraft interiors; and de-icing aircraft.

42. The Agreement also specified the Passenger Services that Global would provide, including, in broad terms: all ticket counter functions, including ticketing and reservations; all gate functions; all baggage service functions; wheelchair services; and a variety of pre- and post-flight activities such as managing standby lists.

43. The Agreement also specified the Mail and Cargo Services that Global would provide, including accepting, releasing, scanning, and transferring mail and cargo.

44. The Agreement made clear that Global alone was responsible for supervising and managing all the Ramp, Passenger, and Mail and Cargo Services.

45. For "all" those specified services, Global agreed it would "use best efforts to adhere to industry-leading practices that drive maximum efficiency in cross-functional workforce utilization and except for the obligations (e.g. training, safety standards, etc.) expressly stated in the [Agreement], will not undertake [Sun Country's] prior staffing or management practices, particularly those which drove inefficiencies in its operational performance."

46.     Global agreed it was "responsibl[e] to provide the adequate level of knowledge and training to its personnel to meet the quality standards of [Sun Country] at all times." Global also agreed it would "ensure that the authorization of specialized personnel performing services for [Sun Country] is valid and current," and agreed that, "[i]f at any time [Global] is unable to provide authorized personnel as requested by [Sun Country], [Global] shall inform [Sun Country] immediately."

47.     With respect to ground service equipment ("GSE"), Global agreed "to maintain [Sun Country's] GSE in the same proper working condition as existed at the start of the agreement," and agreed it would bear the costs of "parts being replaced resulting for [sic] misuse of the GSE by [Global]."

48.     Global further agreed that "[i]n the provision of the services as a whole, due regard shall be paid to safety, security, local and international regulations, applicable IATA and/or ICAO and/or other governing rules, regulations and procedures."

49.     The term of the Agreement was three years, commencing April 24, 2018. Under the Agreement, either party could terminate by giving 90 days prior notice to the other party. In the event of termination, Global agreed "to sustain performance levels to the end date of the initial or extended term of this agreement, and is responsible for bearing all costs necessary to perform to that date, including overtime, temporary duty, etc."

**E.      Sun Country Supports Global During its Transition.**

50.     To facilitate Global's smooth transition into operation, Sun Country worked with Global to take over the MSP Airport ground-handling operations in two phases. On or about April 24, 2018, Global began Ramp Services, and on or about May 1, Global began all other ground-handling functions.

51.     Sun Country provided Global with significant assistance during this transition.  For example, Sun Country suggested that Global consider hiring Sun Country's former ground-handling employees, and repeatedly made those employees available to Global.

52.     Sun Country also agreed, without consideration or contractual obligation, to train new employees that Global recruited during the transition and beyond.  In addition, Sun Country participated in weekly conference calls to discuss and plan for Global's transition.  During those calls, Global emphasized its preparedness for the transition, and it never expressed any concern over its ability to perform all the services specified in the Agreement.

53.     Sun Country also checked in on Global's progress with recruiting and hiring.  For example, on April 10, in response to Sun Country's inquiry about staffing, Global's Senior VP, John Brown, claimed Global had already hired over 120 ramp agents and over 160 passenger and gate agents, and promised it would "over" hire an additional 60 agents.

54.     Unbeknownst to Sun Country, Global's actual hiring was far below the staffing numbers that Global claimed.

### F.     Global Hides Systemic Staffing Problems Through an Unsustainable Bonus Scheme.

55.     Global's ground-handling operations for the first two to three weeks after the transition concluded appeared to reflect adequate staffing levels.

56.     Only later did Sun Country discover that, during this period, Global merely created the illusion of normal operations and staffing with an unsustainable bonus scheme.

57.     In reality, Global had failed to recruit and onboard enough staff for normal operations.  To make up for that, Global paid each employee a cash bonus for each eight-hour shift worked.  That bonus represented up to a 200% increase to each employee's total wage for an eight-hour shift.

58.     At least temporarily, those large bonuses enticed most, if not all, Global's small staff to work nearly every day. But the bonus program was unsustainable and, by mid-May, Sun Country began to notice that Global's staff was dwindling.

59.     Sun Country repeatedly asked Global about its staffing, and Global repeatedly assured Sun Country that things were fine. In fact, they were not.

G.     **Global Breaches the Agreement.**

60.     By late May, Global had failed to achieve or maintain adequate staffing levels for the Ramp, Passenger, and Cargo and Mail Services that it promised to provide under the Agreement.

61.     Sun Country immediately felt the consequences of Global's failure. Without enough agents providing Ramp Services, flight delays increased. Similarly, customers faced longer waits because there were not enough agents providing Passenger Services at gates and ticket counters. There was also a spike in lost and delayed baggage entrusted to Global.

62.     The lack of staffing was compounded by Global's failure to enforce basic safety measures. For example, Global failed to require use of wheel chocks to safely secure tugs, water trucks, and other movable equipment. Similarly, Global neglected to ensure its employees consistently checked for foreign object debris (known as "FOD") before and after flight activity.

63.     In addition, Global failed to maintain Sun Country's GSE in proper working condition, as required by the Agreement. For example, Global permitted use of beltloaders with loose or broken bumpers, which are needed to protect aircraft from damage.

64.     On June 4, Sun Country formally notified Global of its failures to perform the Agreement, and made clear that Global needed to take corrective action by July 5 to ensure it met its contractual obligations.

**H.     Global's Breaches of the Agreement Increase and Intensify in June.**

65.     Rather than take meaningful corrective action, Global's performance further deteriorated in June 2018 as it failed to perform various services required by the Agreement.

66.     *Ramp Services.*  Global chronically understaffed the ramp agent function.  For example, on June 14, Global should have staffed 26 ramp agents but scheduled just nine, two of whom did not report for work.  That left seven agents to perform the work of 26 people.  Global failed to inform Sun Country of this gross shortage, as required by the Agreement.

67.     *Passenger Services.*  Global continued to understaff gate, ticket counter, and curbside check-in agents.  For example, Global often had just one gate agent servicing multiple flights at once, an arrangement that violates Transportation Security Administration ("TSA") protocols.  Without the necessary staff, customer waits at ticket counters soared to over an hour and a half, far greater than the more typical waiting time of 20 minutes.

68.     *Baggage-Related Services.*  Global failed to provide sufficient staff at every stage of baggage handling—from loading and unloading bags to and from aircraft, to staffing the baggage rooms, to handling baggage-related complaints.  As a result, Global lost and damaged bags at an alarming rate and failed to rectify the situation.  For example, in June, one customer reported being on the phone for two days trying to track down bags that Global had lost.

69.     *Cleaning Services.*  Global failed to provide entire categories of cleaning services.  For example, Global promised to perform a deep clean on each aircraft every 45 days.  Yet it never performed a single deep clean.  Nor did Global clean certain building facilities, as required by the Agreement.

70.     *Cargo and Mail Services.*  After Global assumed Cargo and Mail Services, it caused Sun Country's previous 96 percent rate of timely delivering U.S. mail to decline to 40-60%.  In

response, the United States Postal Service ("USPS") suspended its tenders to Sun Country, costing Sun Country hundreds of thousands of dollars in lost revenue and penalties.

71.     At the same time Global's operations at MSP Airport were melting down, its senior-level management was in turmoil.  On information and belief, during this time, Mr. Borg fired most of the company's leadership, including its COO, its Senior VP of Operations, and its Manager of Human Resources.

72.     Making matters worse, Mr. Borg refused to respond to many of Sun Country's concerned calls and emails about Global's worsening performance.

73.     Finally, Sun Country convinced Mr. Borg to meet with its operations team in Minnesota on June 19 to 20 to discuss solutions to Global's failures to perform the Agreement. During this June 19-20 meeting, Mr. Borg refused to accept blame or work toward solutions. Instead, he claimed that the "Minnesota work ethic" (which he used as a pejorative term) was the main problem.

74.     Mr. Borg also admitted during the June 19-20 meeting that he had engaged in "bad faith negotiation" during the RFP process. He attempted to deflect blame by contending that Sun Country had also negotiated in bad faith.  This was simply false; Sun Country acted in good faith throughout this process.

75.     Mr. Borg further claimed the ground-handling operations at MSP Airport were straightforward, and that he would have operations back on track in short order.

76.     On information and belief, Mr. Borg never returned to Minnesota to fix Global's spiraling problems, despite the fact that MSP Airport was Global's largest U.S. operation and despite the fact that he had terminated most of Global's senior management.

77.    Sun Country did, however, manage to persuade Mr. Borg to hire a ground-handling consultant to assess Global's worsening staff issues.

I.    **Global's Systemic Staffing Problems Are Revealed.**

78.    That consultant discovered four systemic problems in Global's staffing and management operations.

79.    First, while Global should have had at least four employees dedicated to recruiting, onboarding, and payroll, it had one such employee.

80.    Second, Global had no infrastructure for recruiting. The consultant discovered that 450 people had responded to Global's online job posting, and all 450 responses were untouched. There was no system to review the responses. Nor was there a system to track turnover so that Global would know what positions needed filling.

81.    Third, Global failed to onboard the few employees it did manage to recruit. In any airport, a critical part of the onboarding process is supplying new employees with airport identification badges to work in secure areas. As a short cut, Global personnel would sign blank badge applications, only later adding the employee's name. This practice criminally violated Section 3.11 of Metropolitan Airport Commission ("MAC") Ordinance No. 117, which provides: "An Authorized Signer shall not sign a badge application form without verifying the identity and eligibility of the applicant to the best of his or her knowledge."

82.    Global's Manager of Human Resources, Lisa Simons, was criminally charged for violating Section 3.11, was convicted of a misdemeanor, and is currently on probation.

83.    In addition to issuing illegal badges, Global staff also improperly escorted un-badged, newly-hired employees on the ramp, failed TSA inspections, and left gates open and unsecured, among other infractions.

84.     Fourth, Global failed to operate a functioning system for scheduling and payroll. For example, its scheduling system allowed for *no* employees to be scheduled on weekends, and, unsurprisingly, that happened regularly.  In addition, because Global failed to track employee turnover, it would schedule employees who had already left the company.

85.     The net result of these systemic staffing and management problems was that Global assembled and maintained a workforce that was just a fraction of what was required to perform its obligations under the Agreement.

### J.     Global Fails to Cure and Instead Terminates the Agreement.

86.     In or around the week of June 25, 2018, Sun Country initiated another call with Mr. Borg to address Global's spiraling problems.  On this call, Mr. Borg once again pointed the finger at the "Minnesota work ethic," and added that Minnesota workers were "drug users."

87.     Within days of that call, on June 29, Mr. Borg sent Sun Country a letter, purporting to provide notice of termination of the Agreement to become effective on September 28, 2018.

88.     Sun Country promptly responded two days later, noting that Global "continues to maintain unacceptably low staffing levels at [MSP] in violation of our [Agreement]" and "demand[ing] immediate correction."  Sun Country also made clear that Global's "recent notice of termination . . . does not abate GAS's obligation to maintain adequate staffing levels while the term of the agreement continues."

### K.     Sun Country Is Forced to Do Global's Work and Then Hire a Replacement Vendor.

89.     After it sent notice of termination, Global all but abdicated its responsibilities under the Agreement.  On July 1, for example, Global staffed just eight ramp agents, when three times that number were needed, and no Global employees at all reported for duty in the baggage room. Staffing was critically low for all of Global's services.

90.     In addition to understaffing, Global abdicated its supervisory responsibilities, which led to violations of safety protocols and damage to equipment. For example, in July, Sun Country had to pay for damage caused when Global employees ripped a ground power unit ("GPU") cable from its mooring by retracting the jet bridge while the cable was still connected to a parked aircraft. Similarly, Sun Country had to pay several thousand dollars after Global employees damaged an air-start unit on loan from another airline. In addition, Global damaged a cargo tug so severely that its frame cracked.

91.     Global's breaches and incompetence harmed Sun Country's brand and reputation with its customers. Global increased customer wait time at ticket counters and gates, further inconvenienced customers by causing flight delays, and lost and damaged customers' bags. Unsurprisingly, Global's actions triggered a wave of customer complaints. From May to July 2018, there was a 600 percent surge in customer complaints filed with the Better Business Bureau ("BBB") and U.S. Department of Transportation ("DOT")—more than were filed during the same three-month period in 2016 and 2017 combined.

92.     By late June, Sun Country could no longer afford to wait for Global to correct its chronic deficiencies. With Sun Country's brand and reputation at risk, the company was forced to deploy its own headquarters staff—including executives—to handle bags, check in passengers, and do other work that Global had been hired and paid to do.

93.     Sun Country's own CEO pitched in to help clean aircraft.

94.     Sun Country also began hiring the ground-handling staff that Global should have hired. Within 18 hours of posting a single ground-handling job, Sun Country was able to attract more than 80 applicants and schedule seven interviews. In total, Sun Country was forced to hire approximately 100 ground handlers to make up for Global's deficiencies.

95.    In July, Sun Country initiated a second RFP for the MSP ground-handling operations in order to replace Global. Sun Country's bargaining positon in this second RFP was compromised by the fact that Global had left Sun Country in dire need of immediate ground-handling help, a fact that was publicly known.  Ultimately, Sun Country was forced to pay substantially more for the ground-handling services than if Global had performed under the three-year Agreement.

96.    The Agreement terminated on or about September 27, 2018, at which time Global was performing only a subset of the services required by the Agreement.

<u>COUNT I</u>

**(Breach of Contract – Global)**

97.    Sun Country realleges the foregoing paragraphs as if fully set forth herein.

98.    The Agreement is a valid contract between Global and Sun Country.

99.    Sun Country performed all its obligation under the Agreement.

100.   Global materially breached the Agreement in multiple ways, including by:

    a) Failing to perform the required Ramp Services;

    b) Failing to perform the required Passenger Services;

    c) Failing to perform the required Mail and Cargo Services;

    d) Failing to maintain GSE in proper working condition;

    e) Failing to provide staff sufficient to perform all the above services;

    f) Failing to notify Sun Country of its staffing deficiencies;

    g) Failing to supervise the above services;

    h) Failing to properly maintain Sun Country's GSE;

i) Failing to meet Sun Country's quality standards in performing or failing to perform the above services; and

j) Failing to abide by governing rules, regulations, and procedures in performing or failing to perform the above services.

101. Global's material breaches of the Agreement have caused Sun Country substantial monetary damages, including, but not limited to: (1) payments to customers for lost or damaged bags, delayed flights, and other disrupted services; (2) payments for equipment Global destroyed or damaged; (3) payments for fees levied due to Global's failure to comply with applicable rules, regulations, and procedures; (4) lost profits and other losses from disruption to Sun Country's cargo and mail business; (5) lost benefits that Sun Country would have received had Global performed as promised; (6) costs incurred to replace the work that Global failed to perform; and (7) lost profits from harm to Sun Country's reputation and brand.

102. Sun Country has suffered damages from Global's material breaches of the Agreement in an amount greater than $50,000.

## COUNT II

### (Fraud – Global and Carmel Borg)

103. Sun Country realleges the foregoing paragraphs as if fully set forth herein.

104. Global and Mr. Borg fraudulently induced Sun Country to enter into the Agreement by making numerous misrepresentations of material fact during the RFP process between December 6, 2017, and February 16, 2018, including, in particular, Mr. Borg's misrepresentations during Global's meeting with Sun Country on February 9, 2018.

105. Global's and Mr. Borg's misrepresentations to Sun County included, among other things, Global's capability and willingness to:

18

a)  Perform the Ramp Services specified in the RFP;

b)  Perform the Passenger Services specified in the RFP;

c)  Perform the Cargo and Mail Services specified in the RFP;

d)  Staff the services specified in the RFP at the levels represented by Mr. Borg and Global;

e)  Recruit staff sufficient to perform all the services specified in the RFP;

f)  Retain staff sufficient to perform all the services specified in the RFP; and

g)  Manage and supervise all the services specified in the RFP.

106.    At the time they made these representations, Defendants knew, or should have known, they were false.  Indeed, Mr. Borg admitted to Sun Country during the June 19-20, 2018 meeting in Minnesota that he and Global had engaged in "bad faith negotiations."

107.    Defendants made these representations with the expectation and intent that Sun Country would rely upon them in deciding whether or not to retain Global to perform the MSP ground-handling operations.  These misrepresentations were separate and distinct from the representations in the Agreement.

108.    In deciding to hire Global to perform the MSP Airport ground handling, Sun Country reasonably relied to its detriment on Defendants' representations, including the misrepresentations identified herein.

109.    As a result of Defendants' fraudulent inducement, Sun Country has suffered damages in excess of $50,000.

### DEMAND FOR JURY TRIAL

Sun Country demands a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Sun Country demands judgment against Defendants as follows:

A.    For all damages allowed by law, including consequential damages, resulting from Defendants' conduct;

B.    For Sun Country's costs, expenses, and reasonable attorneys' fees incurred in this action, as may be permitted by law;

C.    Pre- and post-judgment interest at the highest lawful rate; and

D.    Such other and further relief, both legal and equitable, that the Court deems just and proper.

Dated:  March 1, 2019

DORSEY & WHITNEY LLP

By

Eric R. Sherman (#0331430)
sherman.eric@dorsey.com
David Y. Trevor (#0152997)
trevor.david@dorsey.com
Nicholas J. Bullard (#0397400)
bullard.nick@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Plaintiff*

### Acknowledgment

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat. § 549.211.

DORSEY & WHITNEY LLP

Eric. R. Sherman

 CT Corporation

**Service of Process Transmittal**
03/07/2019
CT Log Number 535055128

**TO:** Andrew Bolender
Lippes Mathias Wexler Friedman LLP
822 A1A N Ste 100
Ponte Vedra Beach, FL 32082-3286

**RE:** **Process Served in Delaware**

**FOR:** GLOBAL AVIATION SERVICES USA, INC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | MN Airlines, LLC, etc., Pltf. vs. Global Aviation Services USA, Inc. and Carmel Borg, Dfts. |
| **DOCUMENT(S) SERVED:** | LETTER, SUMMONS, COMPLAINT |
| **COURT/AGENCY:** | Fourth Judicial District Court, Hennepin County, MN<br>Case # NONE |
| **NATURE OF ACTION:** | Breach of Contract - Global |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/07/2019 at 15:30 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | WITHIN 20 DAYS |
| **ATTORNEY(S) / SENDER(S):** | Eric R. Sherman, Esq.<br>DORSEY & WHITOEY LLP<br>50 South Sixth Street, Suite 1500<br>Minneapolis, MN 55402-1498<br>612-340-2600 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780116950009 |
| **SIGNED:** | The Corporation Trust Company |
| **ADDRESS:** | 1209 N Orange St<br>Wilmington, DE 19801-1120 |
| **TELEPHONE:** | 302-658-7581 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.


always ahead

ERIC R. SHERMAN
(612) 492-6609
FAX (612) 340-8856
sherman.eric@dorsey.com

March 6, 2019

**HAND DELIVERED**

Global Aviation Services USA, Inc.
c/o CT Corporation System Inc.
1010 Dale Street North
Saint Paul, MN 55117-5603

c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

Re:     *MN Airlines, LLC d/b/a Sun Country Airlines v. Global Aviation Services USA, Inc. et al.*

Dear Registered Agent:

Enclosed and served upon you, as registered agent for Global Aviation Services USA, Inc., is the Summons and Complaint in the above-titled matter.

Sincerely,

Eric R. Sherman

Enclosures

cc:     Nicholas J. Bullard

Dorsey & Whitney LLP | 50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | T 612.340.2600 | F 612.340.2868 | dorsey.com

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                               FOURTH JUDICIAL DISTRICT
                                                Case Type: Civil Other/Miscellaneous

| | |
|---|---|
| MN Airlines, LLC d/b/a Sun Country Airlines,<br><br>Plaintiff,<br><br>vs.<br><br>Global Aviation Services USA, Inc., and<br>Carmel Borg,<br><br>Defendants. | Court File No. _____<br>(Judge _____ )<br><br>**SUMMONS TO GLOBAL AVIATION<br>SERVICES USA, INC.** |

THIS SUMMONS IS DIRECTED TO: Global Aviation Services USA, Inc.

1.   **YOU ARE BEING SUED.** The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights.

2.   **YOU MUST REPLY WITHIN 20 DAYS OR AS OTHERWISE ORDERED BY THE COURT TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a written response called an Answer within 20 days of the date on which you received this Summons unless otherwise ordered by the Court. You must serve a copy of your Answer to Eric R. Sherman, Esq., the person who signed the Summons, located at DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498.

3.   **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days or as otherwise ordered by the Court, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: March 6, 2019

DORSEY & WHITNEY LLP

By

Eric R. Sherman (#0331430)
sherman.eric@dorsey.com
David Y. Trevor (#0152997)
trevor.david@dorsey.com
Nicholas J. Bullard (#0397400)
bullard.nick@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff*

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type:  Civil Other/Miscellaneous

| | |
|---|---|
| MN Airlines, LLC d/b/a Sun Country Airlines,<br><br>Plaintiff,<br><br>vs.<br><br>Global Aviation Services USA, Inc., and Carmel Borg,<br><br>Defendants. | Court File No. _____<br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff MN Airlines, LLC d/b/a Sun Country Airlines ("Sun Country"), for its Complaint against Defendants Global Aviation Services USA, Inc. ("Global") and Carmel Borg, states and alleges as follows:

## NATURE OF THE ACTION

1.     In this action, Sun Country seeks to hold Global and its principal, Carmel Borg, to account for (a) fraudulently inducing Sun Country to enter into a ground-handling agreement ("Agreement"); and (b) repeatedly and materially breaching that Agreement.

2.     Sun Country is a Minnesota-based airline, and its main hub is the Minneapolis-Saint Paul International Airport ("MSP Airport"). An integral part of Sun Country's operations at MSP Airport is "ground handling," which refers to the many services aircraft require between landing and takeoff, including handling baggage, checking in customers, servicing the aircraft, pushing it back from the gate, and loading and unloading cargo and mail.

3.     In 2018, Global and Mr. Borg fraudulently induced Sun Country to select Global from among many companies competing to become Sun Country's sole ground handler at MSP

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Civil Other/Miscellaneous

| | |
|---|---|
| MN Airlines, LLC d/b/a Sun Country Airlines,<br><br>Plaintiff,<br><br>vs.<br><br>Global Aviation Services USA, Inc., and Carmel Borg,<br><br>Defendants. | Court File No. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff MN Airlines, LLC d/b/a Sun Country Airlines ("Sun Country"), for its Complaint against Defendants Global Aviation Services USA, Inc. ("Global") and Carmel Borg, states and alleges as follows:

## NATURE OF THE ACTION

1.      In this action, Sun Country seeks to hold Global and its principal, Carmel Borg, to account for (a) fraudulently inducing Sun Country to enter into a ground-handling agreement ("Agreement"); and (b) repeatedly and materially breaching that Agreement.

2.      Sun Country is a Minnesota-based airline, and its main hub is the Minneapolis-Saint Paul International Airport ("MSP Airport"). An integral part of Sun Country's operations at MSP Airport is "ground handling," which refers to the many services aircraft require between landing and takeoff, including handling baggage, checking in customers, servicing the aircraft, pushing it back from the gate, and loading and unloading cargo and mail.

3.      In 2018, Global and Mr. Borg fraudulently induced Sun Country to select Global from among many companies competing to become Sun Country's sole ground handler at MSP

Airport. Global and Mr. Borg did so by representing that Global had the experience, staff, and capabilities to perform effectively all the ground-handling functions that Sun Country required. In reality, however, Global had no such experience, staff, or capabilities, and Mr. Borg knew it. The falsity of Global and Mr. Borg's representations was made clear when, as soon as the Agreement took effect, Global failed to marshal the staff necessary to perform the agreed-upon services and began breaching the Agreement on a regular basis.

4.      Global's chronic understaffing threw a wrench into Sun Country's operations at MSP Airport, triggering a wave of flight delays, lost baggage, and customer complaints. When Sun Country confronted Mr. Borg, he placed the blame on a supposedly weak "Minnesota work ethic," and he confessed that Global had engaged in "bad faith negotiations" of the Agreement.

5.      Mr. Borg's and Global's fraud and breaches of the Agreement caused major damage to Sun Country, including: (1) lost profits from disruption to Sun Country's cargo and mail business; (2) payments to customers for lost and damaged bags; (3) payments for equipment Global destroyed or damaged; (4) replacement costs for the work Global should have done; and (5) lost profits from harm to Sun Country's reputation and brand.

## PARTIES

6.      Sun Country is a Minnesota limited liability company with its principal executive office in Eagan, Minnesota. Sun Country provides air transportation services to destinations throughout the United States, Mexico, Costa Rica, and the Caribbean. Its main and busiest hub is at Terminal 2 of MSP Airport.

7.      Global is a Delaware corporation with a registered office in Saint Paul, Minnesota. Global is engaged in providing ground-handling services to airlines.

8.      Carmel Borg is and was Global's CEO at all times material to this action.

2

Airport. Global and Mr. Borg did so by representing that Global had the experience, staff, and capabilities to perform effectively all the ground-handling functions that Sun Country required. In reality, however, Global had no such experience, staff, or capabilities, and Mr. Borg knew it. The falsity of Global and Mr. Borg's representations was made clear when, as soon as the Agreement took effect, Global failed to marshal the staff necessary to perform the agreed-upon services and began breaching the Agreement on a regular basis.

4.       Global's chronic understaffing threw a wrench into Sun Country's operations at MSP Airport, triggering a wave of flight delays, lost baggage, and customer complaints. When Sun Country confronted Mr. Borg, he placed the blame on a supposedly weak "Minnesota work ethic," and he confessed that Global had engaged in "bad faith negotiations" of the Agreement.

5.       Mr. Borg's and Global's fraud and breaches of the Agreement caused major damage to Sun Country, including: (1) lost profits from disruption to Sun Country's cargo and mail business; (2) payments to customers for lost and damaged bags; (3) payments for equipment Global destroyed or damaged; (4) replacement costs for the work Global should have done; and (5) lost profits from harm to Sun Country's reputation and brand.

## PARTIES

6.       Sun Country is a Minnesota limited liability company with its principal executive office in Eagan, Minnesota. Sun Country provides air transportation services to destinations throughout the United States, Mexico, Costa Rica, and the Caribbean. Its main and busiest hub is at Terminal 2 of MSP Airport.

7.       Global is a Delaware corporation with a registered office in Saint Paul, Minnesota. Global is engaged in providing ground-handling services to airlines.

8.       Carmel Borg is and was Global's CEO at all times material to this action.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Defendants pursuant to Minn. Stat. § 543.19 because Defendants transact business within the State of Minnesota and because their actions have caused injury to Sun Country within the State.

10.     Venue in this Court is proper pursuant to Minn. Stat. § 542.09 because the claims arose, in part, in Hennepin County, Minnesota.

## FACTS

**A.     The Aviation Ground-Handling Industry and Terminology.**

11.     Aviation "ground handling" refers to services that an aircraft needs on the ground between landing and takeoff. Many airlines contract with a vendor to perform some or all their ground-handling functions.

12.     Three broad categories of ground-handling services are relevant to this action: ramp services, passenger services, and cargo and mail services.

13.     *Ramp Services.* These services usually occur on the airport ramp (also known as the "tarmac" or "apron"), and they include, but are not limited to: guiding aircraft in and out of the parking position (known as "marshalling"); towing aircraft; offloading and loading baggage; interior cleaning; draining and servicing lavatories; and de-icing aircraft.

14.     *Passenger Services.* These services occur inside the airport terminal, and include, but are not limited to: checking in passengers; verifying passenger documentation; closing aircraft; processing lost baggage; and accepting incoming passengers.

15.     *Cargo and Mail Services.* These services include receiving, transferring, scanning, and tracking cargo and mail transported by aircraft.

16.     Ground handling is labor intensive, and there is a relatively high attrition rate in ground-handing workforces, especially for outdoor Ramp Services.

17.   Because of that attrition rate, maintaining an adequate workforce is an integral and essential function of a ground-handling vendor.  To maintain that workforce, a ground-handling vendor must (1) continuously recruit and create a pipeline of candidates to fill positions as they open; (2) successfully onboard and train those candidates; and (3) work to retain its existing employees.

**B.    Sun Country's RFP for Ground Handling at MSP Airport.**

18.   In 2017, Sun Country's ground-handling operations at MSP Airport were divided between Sun Country itself and an outside vendor, Swissport International Ltd. ("Swissport").  Sun Country staffed and managed all services except Ramp Services, which were staffed and managed by Swissport.

19.   In late 2017, Sun Country decided to investigate whether to consolidate its ground-handling operations at MSP Airport with one vendor.

20.   To find the best ground-handling vendor, Sun Country issued a Request for Proposal ("RFP") on December 6, 2017, inviting vendors to submit a response.  In the RFP process, Sun Country was assisted by aviation expert, Seabury Consulting, a subsidiary of Accenture.

21.   The RFP's stated goal was "to find the most cost effective solution(s) offering the greatest value while meeting our performance and service level requirements."

22.   The RFP detailed Sun Country's operations at MSP Airport, including its projected flight frequencies and existing facilities and ground support equipment ("GSE").

23.   The RFP listed the services that Sun Country's new vendor must provide, including: all ticket counter functions, all gate functions, all baggage service functions, wheelchair services, bag room, aircraft loading and unloading, aircraft servicing, baggage transfers, aircraft cleaning, mail handling, freight handling, and more.  The RFP called for responding vendors to include a "Staffing Plan" in their responses.

24.     The RFP made clear that the new vendor would be expected to take over Sun Country's ground-handling operations at MSP Airport by May 1, 2018.

25.     At least a dozen vendors, including Global, expressed interest in the RFP and signed non-disclosure agreements in order to participate.

### C.     Defendants Fraudulently Induce Sun Country to Award Global the Ground-Handling Contract.

26.     On December 28, 2017, Global submitted its response to the RFP. Sun Country was already somewhat familiar with Global, as it was providing ground-handling services to Sun Country at two Florida airports. However, the operations at those Florida airports are much smaller, so Sun Country did not have experience with how Global would perform at a hub like MSP Airport.

27.     In its RFP response, Global represented that it was able to perform all the services outlined in the RFP at MSP Airport. Global identified several of its operations that were similar in size and complexity to Sun Country's operations at MSP Airport, and represented that it had the expertise and experience to run those larger, more-complex operations.

28.     When Sun Country requested a staffing plan, Global supplemented its RFP response on December 29 with a "transition plan for MSP" along with a staffing chart (together, "Transition Plan"). In the Transition Plan, Global made specific representations about the number of supervisors, managers, and employees it would provide for ramp, passenger, and cargo services for each day of the week. Global also represented that its "labor solution for both passenger services and ramp is wholly dedicated to your airline which will never change," and promised to "[m]aintain planned staff count and quality," to "over hire by 10% to account for any early attrition," and to aim for an attrition "rate of 20%." The Transition Plan also included specific representations about Global's "recruitment plan."

29.     After a series of follow-up submissions and discussions, Sun Country narrowed the field of vendors to six finalists, one of which was Global, and invited each finalist to an individual meeting.

30.     Sun Country's meeting with Global took place on January 22, 2018.  During that meeting, Sun Country explained to Global its plans for the future, objectives for the RFP, and expectations for a ground handler.  Global assured Sun Country it had the ability to meet all those expectations and perform all the work in the RFP.

31.     Of the finalists, Sun Country initially viewed Global as the least likely to secure the work because it was the smallest.  However, Sun Country remained open-minded and invited Global to another in-person meeting at its Eagan headquarters.

32.     That in-person meeting with Global took place on February 9, 2018.  At the February 9 meeting, Global was represented by its CEO, Mr. Borg, its COO, Jim Murphy, its Senior Vice President, John Brown, and four other executives.  The Global team gave a presentation claiming that Global had the experience, personnel, and capabilities to perform effectively all the ground-handling functions that Sun Country needed at MSP.  Global made specific representations about (1) the numbers of supervisors and managers it would provide (e.g., six Ramp and Passenger Services managers); (2) the specific number of agents it would provide in the morning, afternoon, and evening for Ramp, Passenger, and Cargo and Mail Services; (3) its "recruitment plan" and commitment to "[m]aintain planned staff count & quality"; and (4) its commitment to "over hire by 10% to account for any early attrition" and aim for an "attrition rate of 30%."

33.     Throughout the February 9 presentation, Sun Country questioned Mr. Borg and his team about Global's capability to staff and perform the services.  The Global team answered each

question. Near the end of the meeting, Mr. Borg concluded by reiterating his complete confidence that Global had the experience, personnel, and capabilities to perform all the services outlined in the RFP.

34.     After the meeting, and based on Mr. Borg's and his team's representations, Sun Country viewed Global as the most likely finalist to secure the ground-handling work.

35.     In the following days, Sun Country asked Global follow-up questions about its staffing plans. On February 13, Global's COO, Mr. Murphy, emailed Sun Country, explaining the "credibility of our [staffing] methodology" and reassuring Sun Country that, "I'm confident in our staffing."

36.     On February 13 and 14, after additional communication between the parties, Global submitted its final bid and staffing chart. In those materials, Global again represented that it had the capability to perform all the services specified in the RFP, and again made specific representations about the number of supervisors, managers, and employees it would provide for all those services.

37.     Based on Global's RFP response, its representations (through Mr. Borg and others) that it was capable of performing all the work specified in the RFP at MSP Airport, its assurances about staffing, and its assurances that it would maintain staff levels and keep attrition under control, Sun Country awarded Global the MSP Airport ground-handling work on February 16, 2018.

38.     Sun Country would not have awarded the work to Global, nor would it have entered into the Agreement that followed, if Global and Mr. Borg had not made those representations.

**D.     The Ground-Handling Agreement.**

39.     On or about February 19, 2018, Sun Country and Global entered into a written Standard Ground Handling Agreement ("SGHA") with Annexes A and B1.0. In April 2018, the

7

parties also entered into Annex B1.1. The SGHA and its Annexes A, B1.0, and B1.1 together form the "Agreement."

40.     Under the Agreement, Global agreed it "shall provide" all the ground-handling services and duties that the parties specified in the Agreement for all Sun Country's arriving and departing flights at MSP Airport.

41.     The Agreement specifically identified the Ramp Services that Global would provide, including: loading and unloading aircraft; marshalling and parking aircraft; operating baggage rooms; transferring baggage; servicing aircraft lavatories and water; cleaning aircraft interiors; and de-icing aircraft.

42.     The Agreement also specified the Passenger Services that Global would provide, including, in broad terms: all ticket counter functions, including ticketing and reservations; all gate functions; all baggage service functions; wheelchair services; and a variety of pre- and post-flight activities such as managing standby lists.

43.     The Agreement also specified the Mail and Cargo Services that Global would provide, including accepting, releasing, scanning, and transferring mail and cargo.

44.     The Agreement made clear that Global alone was responsible for supervising and managing all the Ramp, Passenger, and Mail and Cargo Services.

45.     For "all" those specified services, Global agreed it would "use best efforts to adhere to industry-leading practices that drive maximum efficiency in cross-functional workforce utilization and except for the obligations (e.g. training, safety standards, etc.) expressly stated in the [Agreement], will not undertake [Sun Country's] prior staffing or management practices, particularly those which drove inefficiencies in its operational performance."

46.     Global agreed it was "responsibl[e] to provide the adequate level of knowledge and training to its personnel to meet the quality standards of [Sun Country] at all times." Global also agreed it would "ensure that the authorization of specialized personnel performing services for [Sun Country] is valid and current," and agreed that, "[i]f at any time [Global] is unable to provide authorized personnel as requested by [Sun Country], [Global] shall inform [Sun Country] immediately."

47.     With respect to ground service equipment ("GSE"), Global agreed "to maintain [Sun Country's] GSE in the same proper working condition as existed at the start of the agreement," and agreed it would bear the costs of "parts being replaced resulting for [sic] misuse of the GSE by [Global]."

48.     Global further agreed that "[i]n the provision of the services as a whole, due regard shall be paid to safety, security, local and international regulations, applicable IATA and/or ICAO and/or other governing rules, regulations and procedures."

49.     The term of the Agreement was three years, commencing April 24, 2018. Under the Agreement, either party could terminate by giving 90 days prior notice to the other party. In the event of termination, Global agreed "to sustain performance levels to the end date of the initial or extended term of this agreement, and is responsible for bearing all costs necessary to perform to that date, including overtime, temporary duty, etc."

**E.     Sun Country Supports Global During its Transition.**

50.     To facilitate Global's smooth transition into operation, Sun Country worked with Global to take over the MSP Airport ground-handling operations in two phases. On or about April 24, 2018, Global began Ramp Services, and on or about May 1, Global began all other ground-handling functions.

51.     Sun Country provided Global with significant assistance during this transition. For example, Sun Country suggested that Global consider hiring Sun Country's former ground-handling employees, and repeatedly made those employees available to Global.

52.     Sun Country also agreed, without consideration or contractual obligation, to train new employees that Global recruited during the transition and beyond. In addition, Sun Country participated in weekly conference calls to discuss and plan for Global's transition. During those calls, Global emphasized its preparedness for the transition, and it never expressed any concern over its ability to perform all the services specified in the Agreement.

53.     Sun Country also checked in on Global's progress with recruiting and hiring. For example, on April 10, in response to Sun Country's inquiry about staffing, Global's Senior VP, John Brown, claimed Global had already hired over 120 ramp agents and over 160 passenger and gate agents, and promised it would "over" hire an additional 60 agents.

54.     Unbeknownst to Sun Country, Global's actual hiring was far below the staffing numbers that Global claimed.

**F.      Global Hides Systemic Staffing Problems Through an Unsustainable Bonus Scheme.**

55.     Global's ground-handling operations for the first two to three weeks after the transition concluded appeared to reflect adequate staffing levels.

56.     Only later did Sun Country discover that, during this period, Global merely created the illusion of normal operations and staffing with an unsustainable bonus scheme.

57.     In reality, Global had failed to recruit and onboard enough staff for normal operations. To make up for that, Global paid each employee a cash bonus for each eight-hour shift worked.. That bonus represented up to a 200% increase to each employee's total wage for an eight-hour shift.

58.     At least temporarily, those large bonuses enticed most, if not all, Global's small staff to work nearly every day. But the bonus program was unsustainable and, by mid-May, Sun Country began to notice that Global's staff was dwindling.

59.     Sun Country repeatedly asked Global about its staffing, and Global repeatedly assured Sun Country that things were fine. In fact, they were not.

G.     **Global Breaches the Agreement.**

60.     By late May, Global had failed to achieve or maintain adequate staffing levels for the Ramp, Passenger, and Cargo and Mail Services that it promised to provide under the Agreement.

61.     Sun Country immediately felt the consequences of Global's failure. Without enough agents providing Ramp Services, flight delays increased. Similarly, customers faced longer waits because there were not enough agents providing Passenger Services at gates and ticket counters. There was also a spike in lost and delayed baggage entrusted to Global.

62.     The lack of staffing was compounded by Global's failure to enforce basic safety measures. For example, Global failed to require use of wheel chocks to safely secure tugs, water trucks, and other movable equipment. Similarly, Global neglected to ensure its employees consistently checked for foreign object debris (known as "FOD") before and after flight activity.

63.     In addition, Global failed to maintain Sun Country's GSE in proper working condition, as required by the Agreement. For example, Global permitted use of beltloaders with loose or broken bumpers, which are needed to protect aircraft from damage.

64.     On June 4, Sun Country formally notified Global of its failures to perform the Agreement, and made clear that Global needed to take corrective action by July 5 to ensure it met its contractual obligations.

**H.     Global's Breaches of the Agreement Increase and Intensify in June.**

65.     Rather than take meaningful corrective action, Global's performance further deteriorated in June 2018 as it failed to perform various services required by the Agreement.

66.     *Ramp Services.* Global chronically understaffed the ramp agent function. For example, on June 14, Global should have staffed 26 ramp agents but scheduled just nine, two of whom did not report for work. That left seven agents to perform the work of 26 people. Global failed to inform Sun Country of this gross shortage, as required by the Agreement.

67.     *Passenger Services.* Global continued to understaff gate, ticket counter, and curbside check-in agents. For example, Global often had just one gate agent servicing multiple flights at once, an arrangement that violates Transportation Security Administration ("TSA") protocols. Without the necessary staff, customer waits at ticket counters soared to over an hour and a half, far greater than the more typical waiting time of 20 minutes.

68.     *Baggage-Related Services.* Global failed to provide sufficient staff at every stage of baggage handling—from loading and unloading bags to and from aircraft, to staffing the baggage rooms, to handling baggage-related complaints. As a result, Global lost and damaged bags at an alarming rate and failed to rectify the situation. For example, in June, one customer reported being on the phone for two days trying to track down bags that Global had lost.

69.     *Cleaning Services.* Global failed to provide entire categories of cleaning services. For example, Global promised to perform a deep clean on each aircraft every 45 days. Yet it never performed a single deep clean. Nor did Global clean certain building facilities, as required by the Agreement.

70.     *Cargo and Mail Services.* After Global assumed Cargo and Mail Services, it caused Sun Country's previous 96 percent rate of timely delivering U.S. mail to decline to 40-60%. In

response, the United States Postal Service ("USPS") suspended its tenders to Sun Country, costing Sun Country hundreds of thousands of dollars in lost revenue and penalties.

71.     At the same time Global's operations at MSP Airport were melting down, its senior-level management was in turmoil.  On information and belief, during this time, Mr. Borg fired most of the company's leadership, including its COO, its Senior VP of Operations, and its Manager of Human Resources.

72.     Making matters worse, Mr. Borg refused to respond to many of Sun Country's concerned calls and emails about Global's worsening performance.

73.     Finally, Sun Country convinced Mr. Borg to meet with its operations team in Minnesota on June 19 to 20 to discuss solutions to Global's failures to perform the Agreement. During this June 19-20 meeting, Mr. Borg refused to accept blame or work toward solutions. Instead, he claimed that the "Minnesota work ethic" (which he used as a pejorative term) was the main problem.

74.     Mr. Borg also admitted during the June 19-20 meeting that he had engaged in "bad faith negotiation" during the RFP process. He attempted to deflect blame by contending that Sun Country had also negotiated in bad faith. This was simply false; Sun Country acted in good faith throughout this process.

75.     Mr. Borg further claimed the ground-handling operations at MSP Airport were straightforward, and that he would have operations back on track in short order.

76.     On information and belief, Mr. Borg never returned to Minnesota to fix Global's spiraling problems, despite the fact that MSP Airport was Global's largest U.S. operation and despite the fact that he had terminated most of Global's senior management.

77.     Sun Country did, however, manage to persuade Mr. Borg to hire a ground-handling consultant to assess Global's worsening staff issues.

I.      **Global's Systemic Staffing Problems Are Revealed.**

78.     That consultant discovered four systemic problems in Global's staffing and management operations.

79.     First, while Global should have had at least four employees dedicated to recruiting, onboarding, and payroll, it had one such employee.

80.     Second, Global had no infrastructure for recruiting. The consultant discovered that 450 people had responded to Global's online job posting, and all 450 responses were untouched. There was no system to review the responses. Nor was there a system to track turnover so that Global would know what positions needed filling.

81.     Third, Global failed to onboard the few employees it did manage to recruit. In any airport, a critical part of the onboarding process is supplying new employees with airport identification badges to work in secure areas. As a short cut, Global personnel would sign blank badge applications, only later adding the employee's name. This practice criminally violated Section 3.11 of Metropolitan Airport Commission ("MAC") Ordinance No. 117, which provides: "An Authorized Signer shall not sign a badge application form without verifying the identity and eligibility of the applicant to the best of his or her knowledge."

82.     Global's Manager of Human Resources, Lisa Simons, was criminally charged for violating Section 3.11, was convicted of a misdemeanor, and is currently on probation.

83.     In addition to issuing illegal badges, Global staff also improperly escorted un-badged, newly-hired employees on the ramp, failed TSA inspections, and left gates open and unsecured, among other infractions.

84.     Fourth, Global failed to operate a functioning system for scheduling and payroll. For example, its scheduling system allowed for *no* employees to be scheduled on weekends, and, unsurprisingly, that happened regularly. In addition, because Global failed to track employee turnover, it would schedule employees who had already left the company.

85.     The net result of these systemic staffing and management problems was that Global assembled and maintained a workforce that was just a fraction of what was required to perform its obligations under the Agreement.

**J.      Global Fails to Cure and Instead Terminates the Agreement.**

86.     In or around the week of June 25, 2018, Sun Country initiated another call with Mr. Borg to address Global's spiraling problems. On this call, Mr. Borg once again pointed the finger at the "Minnesota work ethic," and added that Minnesota workers were "drug users."

87.     Within days of that call, on June 29, Mr. Borg sent Sun Country a letter, purporting to provide notice of termination of the Agreement to become effective on September 28, 2018.

88.     Sun Country promptly responded two days later, noting that Global "continues to maintain unacceptably low staffing levels at [MSP] in violation of our [Agreement]" and "demand[ing] immediate correction." Sun Country also made clear that Global's "recent notice of termination . . . does not abate GAS's obligation to maintain adequate staffing levels while the term of the agreement continues."

**K.      Sun Country Is Forced to Do Global's Work and Then Hire a Replacement Vendor.**

89.     After it sent notice of termination, Global all but abdicated its responsibilities under the Agreement. On July 1, for example, Global staffed just eight ramp agents, when three times that number were needed, and no Global employees at all reported for duty in the baggage room. Staffing was critically low for all of Global's services.

15

90.    In addition to understaffing, Global abdicated its supervisory responsibilities, which led to violations of safety protocols and damage to equipment. For example, in July, Sun Country had to pay for damage caused when Global employees ripped a ground power unit ("GPU") cable from its mooring by retracting the jet bridge while the cable was still connected to a parked aircraft. Similarly, Sun Country had to pay several thousand dollars after Global employees damaged an air-start unit on loan from another airline. In addition, Global damaged a cargo tug so severely that its frame cracked.

91.    Global's breaches and incompetence harmed Sun Country's brand and reputation with its customers. Global increased customer wait time at ticket counters and gates, further inconvenienced customers by causing flight delays, and lost and damaged customers' bags. Unsurprisingly, Global's actions triggered a wave of customer complaints. From May to July 2018, there was a 600 percent surge in customer complaints filed with the Better Business Bureau ("BBB") and U.S. Department of Transportation ("DOT")—more than were filed during the same three-month period in 2016 and 2017 combined.

92.    By late June, Sun Country could no longer afford to wait for Global to correct its chronic deficiencies. With Sun Country's brand and reputation at risk, the company was forced to deploy its own headquarters staff—including executives—to handle bags, check in passengers, and do other work that Global had been hired and paid to do.

93.    Sun Country's own CEO pitched in to help clean aircraft.

94.    Sun Country also began hiring the ground-handling staff that Global should have hired. Within 18 hours of posting a single ground-handling job, Sun Country was able to attract more than 80 applicants and schedule seven interviews. In total, Sun Country was forced to hire approximately 100 ground handlers to make up for Global's deficiencies.

95.    In July, Sun Country initiated a second RFP for the MSP ground-handling operations in order to replace Global. Sun Country's bargaining positon in this second RFP was compromised by the fact that Global had left Sun Country in dire need of immediate ground-handling help, a fact that was publicly known.   Ultimately, Sun Country was forced to pay substantially more for the ground-handling services than if Global had performed under the three-year Agreement.

96.    The Agreement terminated on or about September 27, 2018, at which time Global was performing only a subset of the services required by the Agreement.

## COUNT I

### (Breach of Contract – Global)

97.    Sun Country realleges the foregoing paragraphs as if fully set forth herein.

98.    The Agreement is a valid contract between Global and Sun Country.

99.    Sun Country performed all its obligation under the Agreement.

100.    Global materially breached the Agreement in multiple ways, including by:

a)   Failing to perform the required Ramp Services;

b)   Failing to perform the required Passenger Services;

c)   Failing to perform the required Mail and Cargo Services;

d)   Failing to maintain GSE in proper working condition;

e)   Failing to provide staff sufficient to perform all the above services;

f)   Failing to notify Sun Country of its staffing deficiencies;

g)   Failing to supervise the above services;

h)   Failing to properly maintain Sun Country's GSE;

    i)  Failing to meet Sun Country's quality standards in performing or failing to perform the above services; and

    j)  Failing to abide by governing rules, regulations, and procedures in performing or failing to perform the above services.

101.    Global's material breaches of the Agreement have caused Sun Country substantial monetary damages, including, but not limited to: (1) payments to customers for lost or damaged bags, delayed flights, and other disrupted services; (2) payments for equipment Global destroyed or damaged; (3) payments for fees levied due to Global's failure to comply with applicable rules, regulations, and procedures; (4) lost profits and other losses from disruption to Sun Country's cargo and mail business; (5) lost benefits that Sun Country would have received had Global performed as promised; (6) costs incurred to replace the work that Global failed to perform; and (7) lost profits from harm to Sun Country's reputation and brand.

102.    Sun Country has suffered damages from Global's material breaches of the Agreement in an amount greater than $50,000.

## COUNT II

### (Fraud – Global and Carmel Borg)

103.    Sun Country realleges the foregoing paragraphs as if fully set forth herein.

104.    Global and Mr. Borg fraudulently induced Sun Country to enter into the Agreement by making numerous misrepresentations of material fact during the RFP process between December 6, 2017, and February 16, 2018, including, in particular, Mr. Borg's misrepresentations during Global's meeting with Sun Country on February 9, 2018.

105.    Global's and Mr. Borg's misrepresentations to Sun County included, among other things, Global's capability and willingness to:

a) Perform the Ramp Services specified in the RFP;

b) Perform the Passenger Services specified in the RFP;

c) Perform the Cargo and Mail Services specified in the RFP;

d) Staff the services specified in the RFP at the levels represented by Mr. Borg and Global;

e) Recruit staff sufficient to perform all the services specified in the RFP;

f) Retain staff sufficient to perform all the services specified in the RFP; and

g) Manage and supervise all the services specified in the RFP.

106.   At the time they made these representations, Defendants knew, or should have known, they were false. Indeed, Mr. Borg admitted to Sun Country during the June 19-20, 2018 meeting in Minnesota that he and Global had engaged in "bad faith negotiations."

107.   Defendants made these representations with the expectation and intent that Sun Country would rely upon them in deciding whether or not to retain Global to perform the MSP ground-handling operations. These misrepresentations were separate and distinct from the representations in the Agreement.

108.   In deciding to hire Global to perform the MSP Airport ground handling, Sun Country reasonably relied to its detriment on Defendants' representations, including the misrepresentations identified herein.

109.   As a result of Defendants' fraudulent inducement, Sun Country has suffered damages in excess of $50,000.

## DEMAND FOR JURY TRIAL

Sun Country demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Sun Country demands judgment against Defendants as follows:

A.    For all damages allowed by law, including consequential damages, resulting from Defendants' conduct;

B.    For Sun Country's costs, expenses, and reasonable attorneys' fees incurred in this action, as may be permitted by law;

C.    Pre- and post-judgment interest at the highest lawful rate; and

D.    Such other and further relief, both legal and equitable, that the Court deems just and proper.

Dated: March 1, 2019

DORSEY & WHITNEY LLP

By _____
Eric R. Sherman (#0331430)
sherman.eric@dorsey.com
David Y. Trevor (#0152997)
trevor.david@dorsey.com
Nicholas J. Bullard (#0397400)
bullard.nick@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff*

### Acknowledgment

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat. § 549.211.

DORSEY & WHITNEY LLP

_____
Eric R. Sherman